CASSELLA COLOR CO. *v.* UNITED STATES (No. 948).[1]

DYES PRODUCED FROM CARBAZOL.

Carbazol is a chemical compound distinct from anthracin, having a different chemical formula, and it is used to produce different dyes from those derived from anthracin. The fact that carbazol is found in association with anthracin does not leave it open to say that a product derived solely from carbazol, not including anthracin, is derived from anthracin. The dyes here are a product of coal tar, some elements being eliminated, but none added, to produce carbazol. They were dutiable at 30 per cent ad valorem under paragraph 15, tariff act of 1909.

### United States Court of Customs Appeals, April 29, 1913.

APPEAL from Board of United States General Appraisers, G. A. 7369 (T. D. 32559).

[Affirmed.]

*Curie, Smith & Maxwell* (*Thomas M. Lane* of counsel) for appellants.

*William L. Wemple,* Assistant Attorney General (*Charles E. McNabb,* assistant attorney, on the brief), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court:

The merchandise in question in this case, known as hydron blue G and hydron blue R, consists of dyes, one being a blue with a

---

[1] Reported in T. D. 33391 (24 Treas. Dec., 642).

greenish tinge and the other a blue with a reddish tinge. Duty was assessed at 30 per cent ad valorem under paragraph 15 of the tariff act of 1909 as "coal-tar dyes or colors not specially provided for in this section." They are claimed to be free of duty under paragraph 487 as dyes derived from anthracin.

The comprehensive finding of facts by the board, which is fully supported by the evidence, we state in the language employed by the board as follows:

(1) The manufacturers purchase in Germany a substance which they call crude anthracin.

(2) This substance is an intermediate product obtained in the distillation of coal tar and contains anthracin, carbazol, and other ingredients mechanically combined.

(3) The manufacturers subject this so-called crude anthracin to a process for the purpose of separating the carbazol from the anthracin and other constituents.

(4) By further processes applied only to the carbazol they produce the dyes here in question.

These processes may be better understood from the following diagram:

CRUDE ANTHRACIN MASS.

This mass contains carbazol, phenanthren, and other associated bodies. When treated with caustic potash, a suitable solvent and heat yields—

| Carbazol potassium salt. (Treated with ethyl chloride.) | Carbazol potassium salt. (Treated with steam.) |
|---|---|
| Ethyl carbazal. (Dissolved with sulphuric acid and treated with nitrosophenol yields) | Carbazol. (Dissolved with sulphuric acid and treated with nitrosophenol yields) |
| Idophenolic compound: (Treated with sulphur and sodium sulphide yields) | Indophenolic compound. (Treated with sulphur and sodium sulphide yields) |
| Hydron blue G. | Hydron blue R. |

(5) Carbazol is a chemical compound distinct from anthracin, having a different chemical formula and used for producing different dyes from those derived from anthracin.

The board held that, within the meaning of paragraph 487, these dyes were not derived from anthracin. It is contended by the importers that as in the crude mass, sometimes called crude anthracin by authorities on chemistry and sometimes referred to in such works as commercial anthracin, the substance of carbazol is found in association with anthracin, carbazol should be construed as derived from anthracin.

Authorities are cited to the point that tariff terms are usually understood to have been employed in their commercial sense. This proposition is too well accepted to require elaboration or discussion. But this is not such a case. Anthracin is not named, *eo nomine,* as the ingredient entitled to free entry. It is a derivative from that

substance. The question is whether in the use of the term "derived from anthracin" a derivative from the substance of anthracin as such was intended or whether a product which entirely excludes anthracin may be treated as within the terms of the paragraph.

We do not think this latter construction permissible. It happens that carbazol and anthracin at one stage of the processes reducing coal-tar preparations are in association. But they are entirely distinct substances, and it is a stretch to say that a dye derived from carbazol is derived from anthracin. Had there been an express provision in the tariff act for dyes derived from carbazol, there would be no room for discussion. There is no such express provision, but there is a general provision for coal-tar dyes, which comprehends and includes dyes derived from carbazol. Carbazol and anthracin are two distinct chemical compounds, having different chemical formulas. If the contention of the importers be allowed, the phrase "derived from anthracin" would, as pointed out by the board, be given a meaning that would include substances derived from compounds entirely foreign to anthracin and which, in any known chemical test, would not show the presence of anthracin or any characteristic due to the use of anthracin. As anthracin and carbazol boil off at the same degree of temperature, it would be certainly as appropriate to say that this is a product of carbazol as to say that it is a product of anthracin.

We think the illustration given in the brief of Government's counsel is apt. Lead, zinc, gold, and silver often appear in lead ore. A product of gold and silver extracted from such ore would not in any proper sense be held to be derived from lead. Nitrate of silver, made from silver, would not be held to be derived from lead rather than from silver because the silver was obtained from lead ore. So in this case the fact that carbazol is found in association with anthracin does not leave it open to say that a product derived solely from carbazol and not including anthracin is derived from the latter substance.

The cases cited by the appellant do not, we think, sustain the contention made. *In re* Pickhardt (T. D. 20728) it was held that the—

ordinary and commonly accepted meaning of the words "derived from" is "made or prepared from," "produced from," or "obtained from." The words "dyes derived from anthracin" mean dyes of which anthracin is the source or base. They do not mean anthracin itself, nor dyes made wholly of anthracin, but dyes produced or obtained from anthracin by the extraction of some of its elements and their utilization by actual substitution with other substances. If the manufacturer starts with anthracin, and, by partial replacement or any other process, produces a dye, that dye is derived from anthracin, but not otherwise.

This is far from saying that a dye may be said to be derived from anthracin when anthracin is wholly displaced by other substances, whether by substances found in association or substances applied from other sources. See also Farbenfabriken Co. *v.* United States (102 Fed., 602).

Counsel for the importers cites the case of *In re* W. J. Matheson & Co. (Ltd.) (49 Fed., 272) in support of his contention. That case related to "toluidine base" made from a substance called "toluole." The commercial source of "toluole" was shown to be coal tar, from which it was isolated by a process of distillation, and the question presented was whether the substance in question was a product of coal tar. The court said:

> The question as to such a compound as this being improperly described as a product of coal tar because some of the constituents of coal tar have disappeared, is, I think, sufficiently answered by the testimony, which shows that from pitch, which is expressly enumerated as one of the coal-tar products, several of its constituents have been eliminated. I do not think it was the intention of Congress to restrict these paragraphs to products or preparations in which the entire constituents of coal tar still remained, simply changed in some way or other by manufacture. Nor is it particularly material that other substances have been added, if the determining characteristic of the product or preparation is something which it has received from coal tar, and this the testimony shows.

The case does not sustain the contention. Within the rule which we adopt the dyes in question are a product of coal tar. Some of the elements have been eliminated; none others are added. But the determining characteristic, in fact the entire substance of the product, is derived from carbazol, which in turn is a product of coal tar, but which is not a product of anthracin, although found in association with it.

The decision of the Board of General Appraisers is *affirmed*.