(C. D. 1788)

## ESSO STANDARD OIL COMPANY *v.* UNITED STATES

United States Customs Court, First Division

(Decided May 31, 1956)

*Sharretts, Paley & Carter* (*Howard Clare Carter* and *Richard F. Weeks* of counsel) for the plaintiff.

*George Cochran Doub*, Assistant Attorney General (*Richard E. FitzGibbon*, trial attorney), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: This case has been submitted for decision upon the following stipulation:

IT IS HEREBY STIPULATED AND AGREED by and between the parties hereto, subject to the approval of the Court, that the merchandise covered by the above mentioned protest assessed with duty at 12½% ad valorem under paragraph 1 of the Tariff Act of 1930, as amended by the Trade Agreement with Mexico, T. D. 50797, consists of naphthenic acids the same in all material respects as the merchandise the subject of *United States* v. *Esso Standard Oil Co.* 42 C. C. P. A. (Customs) 144, C. A. D. 587, and that the record in C. A. D. 587 be incorporated with the record in this case.

It is further stipulated and agreed that the claim in this protest is limited to the claim that the merchandise is not subject to duty or tax at ¼¢ per gallon under section 3422 of the Internal Revenue Code, as amended by the General Agreement on Tariffs and Trade, T. D. 51802 and this protest is abandoned in all other respects.

It is further stipulated and agreed that the protest be submitted on this stipulation.

The foregoing agreement, it will be observed, limits the point for decision by the court to the inquiry as to whether the imported merchandise is subject to the levy of a tax or duty of one-fourth of 1 cent per gallon under the provisions of section 3422 of the Internal Revenue Code, as amended by the General Agreement on Tariffs and Trade, T. D. 51802. Furthermore, since the stipulation specifies that the importation before us consists of "naphthenic acids the same in all material respects as the merchandise the subject of *United States* v. *Esso Standard Oil Co.*," it must be assumed, as found by the appellate court in the incorporated case, *supra*, that the acids in question are not "Petroleum, * * * refined," and that naphthenic acid is not a "distillate of petroleum." It also appears from the incorporated record that crude petroleum, as taken from the earth, is the original source of the naphthenic acids under consideration and that such acids are produced by processing crude petroleum and its fractions.

Dr. Edwin R. Littmann, a witness appearing on behalf of the plaintiff in the incorporated case, testified as follows:

Q. What are naphthenic acids?—A. Naphthenic acids are naturally occurring organic acids found in petroleum.

Q. Are they one acid or a mixture of acids?—A. As the term is commonly used in industry, it is a very complex mixture of acids.

*    *    *    *    *    *    *

Q. Are naphthenic acids a constituent of crude petroleum?—A. Yes. (R. 16–17.)

*    *    *    *    *    *    *

Q. Is naphthenic acid a constituent of petroleum distillates?—A. Yes. (R. 17.)

*    *    *    *    *    *    *

Q. Will you please define petroleum?—A. Petroleum is a complex mixture of organic compounds, chiefly hydrocarbons, but containing also associated nitrogen compounds, sulfur compounds, oxygenated compounds, perhaps others. Petroleum is usually found in subsoil structures and petroleum is often referred to as one of the constituents or any one of any group of the constituents of the crude petroleum as it is taken from the ground.

Q. How do you define refined petroleum?—A. A refined petroleum is a petroleum which has been either chemically or physically treated to remove such impurities as would interfere with its ultimate use. (R. 33–34.)

Dr. Harry L. Lochte, a witness called by the plaintiff, corroborated Dr. Littmann's testimony:

Q. Are naphthenic acids found in crude petroleum?—A. Yes.

Q. Is there one acid present, or a mixture of acids?—A. A mixture.

Q. Are naphthenic acids found in distillates of petroleum?—A. Yes, that is where they are usually isolated. (R. 82.)

The testimony of the witnesses Littmann and Lochte as to the existence of naphthenic acids in natural deposits of crude petroleum was corroborated by Dr. Victor K. LaMer, another witness for the plaintiff:

X Q. Do you know how the naphthenic acid, which is involved in this importation, was made?—A. It existed naturally in the oil. (R. 108.)

Gerald M. Fisher, testifying on behalf of the defendant, explained the processes by which naphthenic acid is produced, as follows:

Q. You start with crude petroleum?—A. Yes.

Q. What do you do with that crude petroleum to obtain the gas oil fraction?—A. That is put through a tubular still, the industry uses tubular stills 100 per cent, in which the crude is pumped through tubes into a furnace; at that time the crude is heated up to a high temperature and then goes into what we call a fractionating tower and that fractionating tower has several take-offs. It has an overhead and side—the gasolene being the lightest boiling product, comes out of the top of the column. The kerosene would come out of the take-off just below that, and the gas oil further down on the column. (R. 144–145.)

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Q. Having obtained the gas oil or the kerosene fraction, what is next done?—A. As I previously started to say, we treat both the kerosene and the gas oil with dilute solution of caustic soda for two purposes. One to refine the product, the other to obtain valuable by-products, namely, naphthenic acids from those particular petroleum distillates. (R. 145.)

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

A. After the petroleum distillates, gas oil and kerosene, have been contacted, with the required amount of dilute caustic soda solution, they are then pumped to a settling tank and the sodium naphthenate solution settles to the bottom of the tank. We then pump that about a mile to our treating area and put it into storage tanks and allow it to settle as long as possible because it contains certain entrained petroleum oils and we don't want to have the naphthenic acids in it because they act as impurities. So we allow it to settle as long as possible, usually three or four days, at which time we have a clear solution of sodium naphthenate in water. That solution is then pumped to another tank to which sulfuric acid is added. In that reaction, the sulfuric acid converts the sodium

naphthenate into naphthenic acids and sodium sulfate. The naphthenic acids being lighter than water rise to the surface and are skimmed off, and the sodium sulfate solution is pumped away to the sewer. (R. 146–147.)

\* \* \* \* \* \* \*

JUDGE MOLLISON: From how many fractions of petroleum may you obtain naphthenic acid?

THE WITNESS: I previously stated it occurs all the way from the gasolene to the residuum in various amounts.

Q. State the fractions.—A. Gasolene, kerosene, gas oil, lube oil and residuum. (R. 161–162.)

Dr. Vladimir L. Shipp, a witness for the defendant, on cross-examination, identified naphthenic acids as liquids:

X Q. Is it your understanding that all known naphthenic acids, when purified from tarry entrainment, phenolic and sulfur compounds, and freshly distilled, are colorless or yellowish liquid possessing a peculiar odor more pronounced in the low molecular acids?—A. Yes. (R. 267.)

Harold Edward Bramston-Cook, a Government witness, testified concerning commercial production of naphthenic acids as follows:

Q. From what fractions of crude petroleum are naphthenic acids commercially produced?—A. Naphthenic acids are commercially produced from kerosene fractions and so-called gas oil fractions.

Q. Is the process of commercial manufacture of naphthenic acid the same, no matter from which of these two fractions of crude petroleum are used?—A. It is. (R. 305.)

Accepting, as we must, the facts and the law in the incorporated case, *United States* v. *Esso Standard Oil Co.*, *supra*, and adopting as facts the statements in the stipulation, *supra*, the issue for determination may be stated as follows:

Assuming that naphthenic acid is not a refined petroleum or a distillate of petroleum but that its original source is crude petroleum, as taken from the earth, and that the naphthenic acid now under consideration is a liquid product, produced as hereinbefore explained, is it properly classifiable for revenue purposes as a liquid derivative of crude petroleum, subject to the levy of one-fourth of 1 cent per gallon provided for in section 3422, title 26, of the United States Code, as amended by the General Agreement on Tariffs and Trade, T. D. 51802?

The plaintiff maintains the importation cannot be thus classified and contends that our appellate court, in the incorporated *Esso Standard Oil* case, *supra*, has already decided that naphthenic acid is not obtained from petroleum and, therefore, cannot be a derivative of crude petroleum. In support of that position, it quotes the following language from the incorporated decision:

\* \* \* If the naphthenic acid as present in the crude oil is not petroleum because it is not a hydrocarbon, then no part of it could be a distillate obtained

from petroleum, because *it would not be obtained from petroleum*, but from a compound *other than petroleum.* [Emphasis supplied.]

Plaintiff further argues that, while naphthenic acid is found in crude petroleum, it is really part of a mixture of which crude petroleum consists, and that, as found in nature in crude petroleum, the naphthenic acid is not an integral part of the crude oil, but is, in reality, another substance existing independently as part of a heterogeneous mixture referred to as crude petroleum. It cannot be controverted that, as plaintiff states in its brief:

Petroleum is a very complex mixture of hydrocarbons, acids, phenols, nitrogen compounds, and sulfur compounds (R. 43). It has no empirical formula. It contains principally hydrocarbons (R. 61, 82). By a combination of distillation and extraction (and the method of production giving the naphthenic acid in suit was such a combination), the acids in petroleum are separated from the hydrocarbons.

Our real inquiry in this case, then, is to determine what Congress meant by the language "all liquid derivatives of crude petroleum," as used in section 3422 of the Internal Revenue Code, *supra.* Should the technical interpretation that, in order for one substance to be derived from another, the derived material must have previously existed as part of a chemical compound constituting the original substance be applied? Furthermore, to be a derivative, must a material have been derived directly from the original substance, without any intervening steps or processes? Plaintiff, in its brief, argues that "* * * a derivative of a derivative of X is not a derivative of X. The import is a derivative of sodium naphthenate, not of petroleum."

We are not helped in reaching a proper conclusion by the first two cases cited by the plaintiff. That the imported product is a manufactured article is conceded. Evidently, the cases of *United States* v. *McLaughlin & Freeman,* 35 C. C. P. A. (Customs) 34, C. A. D. 368, and *Balfour Guthrie & Co., Ltd.* v. *United States,* 39 C. C. P. A. (Customs) 12, C. A. D. 457, are cited only in support of that point. Neither does the case of *Werner G. Smith Co., Div. Archer Daniels Midland Co.* v. *United States,* 40 C. C. P. A. (Customs) 90, C. A. D. 503, assist us in determining the intent of Congress in the statute under examination.

The case of *Cassella Color Co.* v. *United States,* 4 Ct. Cust. Appls. 113, T. D. 33391, does appear to have a bearing on the issue now before us. In that case, the merchandise in question consisted of certain dyes, "one being a blue with a greenish tinge and the other a blue with a reddish tinge." Duty was assessed at 30 per centum ad valorem under paragraph 15 of the Tariff Act of 1909 as "coal-tar dyes or colors not specially provided for in this section." The dyes in question were claimed to be free of duty under paragraph 487 of the same act as "dyes derived from anthracin."

In the *Cassella* case, *supra,* the court pointed out that the manufacturers purchased in Germany a certain substance called crude

anthracin, which is an intermediate product "obtained in the distillation of coal-tar and contains anthracin, carbazol, and other ingredients mechanically combined." This crude anthracin was subjected to a process intended to separate the carbazol from the anthracin and other constituents. By further processing carbazol, the dyes in question were produced.

On the foregoing statement of facts, the Board of Appraisers, 22 Treas. Dec. 887, T. D. 32559, held that, within the meaning of paragraph 487, these dyes were not derived from anthracin. The appellate court, in affirming the findings of the board, stated:

* * * It is contended by the importers that as in the crude mass, sometimes called crude anthracin by authorities on chemistry and sometimes referred to in such works as commercial anthracin, the substance of carbazol is found in association with anthracin, carbazol should be construed as derived from anthracin.

* * * The question is whether in the use of the term "derived from anthracin" a derivative from the substance of anthracin as such was intended or whether a product which entirely excludes anthracin may be treated as within the terms of the paragraph.

We do not think this latter construction permissible. It happens that carbazol and anthracin at one stage of the processes reducing coal-tar preparations are in association. But they are entirely distinct substances, and it is a stretch to say that a dye derived from carbazol is derived from anthracin. (pp. 114–115.)

In the *Cassella Color Co.* case, *supra*, our appellate court, page 115, quoted the following paragraph from "*In re* Pickhardt (T. D. 20728)":

ordinary and commonly accepted meaning of the words "derived from" is "made or prepared from," "produced from," or "obtained from." The words "dyes derived from anthracin" mean dyes of which anthracin is the source or base. They do not mean anthracin itself, nor dyes made wholly of anthracin, but dyes produced or obtained from anthracin by the extraction of some of its elements and their utilization by actual substitution with other substances. If the manufacturer starts with anthracin, and, by partial replacement or any other process, produces a dye, that dye is derived from anthracin, but not otherwise.

The provision in question in the *Cassella* case, *supra*, was not for dyes derived from "coal tar," but was for dyes derived from "anthracin." The dyes there in question, however, were produced by a process applied only to carbazol. Counsel for the plaintiff, in his brief, maintains that because the naphthenic acids here under consideration come off the still in combination with gas oil, neither one is "derived" from the other. Without conceding the correctness of this contention, the record does show, however, that both the gas oil and the naphthenic acid in combination are derived directly from crude petroleum.

In the case at bar, the provision under consideration is not "all liquid derivatives of gas oil," which factor would parallel the situation in the *Cassella* case, *supra*, where the provision in question was for dyes, derived from anthracin, which was obtained from crude anthra-

cin, but the provision here under consideration concerns "all liquid derivatives of crude petroleum," and the record discloses that both the gas oil and the naphthenic acid here processed are derived from crude petroleum. Accordingly, in our opinion, the holding in the *Cassella* case, *supra*, is not controlling in the determination of the present issue.

Counsel for the plaintiff, in his brief, directs our attention to the case of *Farbenfabriken of Elberfeld & Co.* v. *United States*, 102 Fed. Rep. 603. However, that case lays down the rule that revenue laws should be construed in their common or ordinary sense, as shown by the following quotation:

> * * * "It is entirely well settled that, in the interpretation of the revenue laws, words are to be taken in their commonly received and popular sense, or according to their commercial designation, if that differs from the ordinary understanding of the word." Lutz v. Magone, 153 U. S. 105, 14 Sup. Ct. 777, 38 L. Ed. 651; U. S. v. Fuel Co., 172 U. S. 339, 19 Sup. Ct. 200, 43 L. Ed. 469. It is obvious that the popular meaning of the term is the meaning given in lexicons, and which is obtained by transmission or produced from, and refers, in this case, to, its physical origin.

The Government places considerable reliance on the case of *Kuttroff, Pickhardt & Co., Inc.* v. *United States*, 21 C. C. P. A. (Customs) 332, T. D. 46864, wherein our appellate court made reference to the language used in the case of *"In re Pickhardt,"* T. D. 20728, *supra*, heretofore quoted, as to the ordinary and commonly accepted meaning of the words "derived from."

As an additional aid in determining the real intent of Congress as to the scope and application of section 3422 of the Internal Revenue Code, it will be helpful to take a look at the entire section, which reads as follows:

### § 3422. Petroleum and derivatives.

Crude petroleum, ½ cent per gallon; fuel oil derived from petroleum, gas oil derived from petroleum, and all liquid derivatives of crude petroleum, except lubricating oil and gasoline or other motor fuel, ½ cent per gallon; gasoline or other motor fuel, 2½ cents per gallon; lubricating oil, 4 cents per gallon; paraffin and other petroleum wax products, 1 cent per pound. The tax on the articles described in this section shall apply only with respect to the importation of such articles. (53 Stat. 414.)

It will be observed that the "gas oil derived from petroleum" is assessed at the rate of one-half of 1 cent per gallon, the same as "all liquid derivatives of crude petroleum," the change to one-fourth of 1 cent per gallon having been effected through a trade agreement, as hereinbefore noted. It is not controverted but that "gas oil" was the source of the naphthenic acid in the incorporated case, and must, under the stipulation, be assumed to have been the source of the imported acids now before us. Now, since naphthenic acid is obtained from gas oil, a derivative of petroleum by the processes hereinbefore

set forth, may it be said to be a liquid derivative of petroleum? If, to be a derivative of petroleum, it must have previously been in chemical combination with petroleum and have been extracted or taken from petroleum by one direct process, without any intervening steps, then, clearly, upon the record, naphthenic acid is not a "liquid derivative of crude petroleum." On the other hand, if a "liquid derivative of crude petroleum" is to be defined as a substance which had its source in crude petroleum, as removed from the earth, it may be classified as a "liquid derivative of petroleum." Adopting the ordinary or common meaning, as applied to tariff terms, we think that, the physical source of the product being crude petroleum, the acid is a "liquid derivative of petroleum."

In the case of State v. Wong Fong, 241 Pac. 1072 (Mont.), the defendant was accused of possession of cocaine, which was alleged to be a derivative of opium or coca leaves. In discussing the meaning of derivative, the court stated—"A derivative is that which is derived; anything obtained or deduced from another." In a later case, State v. Mah Sam Hing, 295 Pac. 1014 (Mont.), the same court had before it the construction of a statute prohibiting the possession of certain enumerated drugs or the derivatives thereof. The drug in possession of the defendant was described by a chemist as "hydrochloride cocaine." The same chemist testified that hydrochloride cocaine is a direct derivative of alkaloid cocaine, which is derived directly from opium or coca leaves. Alkaloid cocaine was not specifically mentioned in the statute, but opium or coca leaves were. Upon that statement of facts, the court found the derivative (hydrochloride cocaine) of the derivative (alkaloid cocaine) to be a derivative of the opium or coca leaves, expressly mentioned in the statute. If we are to apply the same interpretation to the provisions of section 3422 of the Internal Revenue Code, supra, in arriving at the true intent of Congress as to what is to be included within the definition of a "liquid derivative of crude petroleum," as our Montana Supreme Court applied in defining the meaning of "derivative," it would then appear that the acids now before us are liquid derivatives of crude petroleum.

Webster's New International Dictionary, Second Edition, Unabridged, 1956, gives the ordinary meaning of derivative as follows:

derivative, n. 1. One that is derived; anything obtained or deduced from another.

We are inclined to the view and hold that, since the naphthenic acids in question have their source in crude petroleum, as it is taken from the ground, and are produced through certain processes involving distillation and mechanical and chemical treatments, the acids really are liquid derivatives of crude petroleum under the provisions of the Internal Revenue Code, now under consideration, and should be

subject to the tax provided in the United States Code (26 U. S. C. § 3422), as modified by the General Agreement on Tariff and Trade, T. D. 51802.

The protest is, therefore, overruled and judgment will be entered accordingly.