ESSO STANDARD OIL CO. *v.* UNITED STATES (No. 4894) [1]

_____

[1] C. A. D. 644.

United States Court of Customs and Patent Appeals, March 29, 1957

*Sharretts, Paley & Carter (Joseph F. Donohue* of counsel) for appellant.
*George Cochran Doub,* Assistant Attorney General and *Richard E. FitzGibbon,* Chief, Customs Section for the United States.

[Oral argument February 13, 1957, by Mr. Donohue and Mr. FitzGibbon]

Before JOHNSON, Chief Judge, and O'CONNELL, WORLEY, RICH, and JACKSON (retired), Associate Judges

WORLEY, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, First Division, C. D. 1788, overruling a protest by the importer and holding that naphthenic acid is a liquid derivative of crude petroleum subject to the tax of ¼ of one cent per gallon provided for in section 3422 of the Internal Revenue Code, as modified by the General Agreement on Tariffs and Trade, T. D. 51802. The pertinent portion of that section follows:

Crude petroleum, * * * and all liquid derivatives of crude petroleum, * * * ½ cent per gallon; * * *.

The rate of ½ cent per gallon was reduced to ¼ cent per gallon by the General Agreement on Tariffs and Trade, *supra.*

The sole issue presented is whether the merchandise is a liquid derivative of crude petroleum within the meaning of the section quoted.

It has been stipulated that the merchandise is the same in all material respects as that involved in *United States* v. *Esso Standard Oil Co.,* 42 C. C. P. A. (Customs) 144, C. A. D. 587. The record in that case has been incorporated in the instant case. As above stated, the merchandise is naphthenic acid, and the following portion of our decision in the incorporated case is pertinent as to the manner in which it is prepared:

The following facts are disclosed by the record. It appears that naphthenic acid, as it is known to the trade, is in reality a group or series of acids, which

have the empirically derived formula, $C_nH_{2n-2}O_2$, or $C_nH_{2n-1}COOH$, indicating that the substance is an organic acid.

Naphthenic acid is present to some extent in all crude petroleum, occurring most often in amounts less than one per centum, but sometimes as high as three to five per centum. In the few crudes having relatively high percentages of naphthenic acid, the acid, if not removed, will tend to make some of the products of petroleum less acceptable commercially. On the other hand, naphthenic acid, is itself in demand as a constituent of paint dryer, or "napalm" (jellied gasoline) and of preservatives.

*    *    *    *    *    *    *

It appears that the petroleum fraction which contains the naphthenic acid is treated with a dilute sodium hydroxide (caustic soda) solution. The sodium hydroxide being a base neutralizes the naphthenic acid, and the naphthenic acid, generally speaking, may be said to "pass into" the solution. The solution being heavier than the petroleum fraction, settles to the bottom of the container, where it is tapped off.

Next to the solution is treated with dilute sulphuric acid which "frees" the naphthenic acid from the solution. The solution and naphthenic acid are now separated by settling. The remaining solution is sodium sulphate and water.

In other words, according to the record, we have described this process in terms of the actual steps taken therein:—a treating of a petroleum fraction with a solution of caustic soda; a mechanical separation of the solution from the fraction; a treating of the separate solution with sulfuric acid; and a final mechanical separation of naphthenic acid from the solution. In each of the three naphthenic acid cases, those identical steps were taken.

The question at issue in the incorporated case was whether the naphthenic acid, produced as described, was a "distillate obtained from petroleum" within the meaning of paragraph 1733 of the Tariff Act of 1930. The court held that it was not, basing its decision primarily on the holding that "The import was produced and obtained by a chemical process—be that a process of completed reaction or equilibrium— and not to any effective extent by distillation."

It was pointed out in our former decision that in the process described the sodium hydroxide unites chemically with the naphthenic acid so that at least the greater part of such acid is converted to sodium naphthenate, and that when such sodium naphthenate is subsequently reconverted to naphthenic acid by the action of sulphuric acid "the hydrogen atom which gives the naphthenic acid its acid character comes principally from the sulfuric acid." It thus appears that the naphthenic acid which constitutes the instant merchandise is composed of ingredients obtained from the naphthenic acid present in the crude petroleum, with the addition of some hydrogen from the sulphuric acid.

As stated in the quoted portions of our former decision, naphthenic acid is present to some extent in all crude petroleum. That statement is amply supported by the record and is not disputed here, although appellant notes that the acid is not a hydrocarbon but an organic acid found with petroleum as an impurity. It is clear from

the record, however, that, whether or not naphthenic acid is regarded as an impurity it is still a constituent of crude petroleum. Thus the importer's witnesses testified as follows:

Edwin R. Littman:

Q. Are naphthenic acids a constituent of crude petroleum?—A. Yes.

Harry L. Lochte:

Q. Are naphthenic acids found in crude petroleum?—A. Yes.

James Howard McAteer:

Q. In your opinion, Doctor, are these naphthenic acids refined petroleum?—A. Yes, they are.

Q. On what do you base that statement?—A. I base that statement on the fact that the naphthenic acids are in the natural constituents of petroleum, * * *.

The Government's witness Vladimir L. Shipp testified:

Q. Do you agree that naphthenic acid exists naturally in crudes and distillates and can be extracted by caustic soda?—A. I agree that naphthenic acid occurs naturally in crudes, but they don't exist naturally in distillates because the distillate is not a natural product.

It is evident from the foregoing that naphthenic acid forms a part of crude petroleum and that the ingredients of the imported naphthenic acid were obtained from such petroleum.

In support of the contention that the instant merchandise is not derived from crude petroleum, appellant relies principally on the decision in *Cassella Color Co.* v. *United States*, 4 Ct. Cust. Appls. 113, T. D. 33391. That case involved certain dyes which were obtained from a substance sometimes called crude or commercial anthracin and containing both anthracin and carbazol. The dyes were obtained wholly from the carbazol, and it was held that they were not derivatives of anthracin. In reaching that conclusion, however, the court distinguished between "the substance of anthracin as such" and the crude or commercial anthracin, which contained carbazol, and held that the statute under consideration referred to the former. That decision, therefore, is not in point here where the statute refers expressly to crude petroleum.

Appellant also relies on the following statement in our decision in the incorporated case:

If the naphthenic acid as present in the crude oil is not petroleum because it is not a hydrocarbon, then no part of it could be a distillate obtained from petroleum because it would not be obtained from petroleum but from a compound other than petroleum.

It is to be noted, however, that the quoted statement refers to "a distillate obtained from petroleum," whereas the section of the Tariff Act here under consideration refers to derivatives of *crude* petroleum.

Petroleum or crude oil is a complex chemical substance of which naphthenic acid is a component.

The following interpretation of the words "derived from" in *In re Pickhardt*, T. D. 20728, 1 Treas. Dec. 373, was cited with approval in the *Cassella* case and in *Kuttroff, Pickhardt & Co., Inc.* v. *United States*, 21 C. C. P. A. (Customs) 332, T. D. 46864:

The ordinary and commonly accepted meaning of the words "derived from" is "made or prepared from", "produced from", or "obtained from." The words "dyes derived from anthracin" means dyes of which anthracin is the source or base. They do not mean anthracin itself, nor dyes made wholly of anthracin, but dyes produced or obtained from anthracin by the extraction of some of its elements and their utilization by actual substitution with other substances. If the manufacturer starts with anthracin, and, by partial replacement or any other process, produces a dye, that dye is *derived* from anthracin, but not otherwise. (Italics quoted.)

In accordance with the quoted statement, which we think is correct, a substance may properly be said to have been derived from a source material even though the process by which it was produced from that material involved the addition of ingredients from other sources. Consequently, the fact that the instant merchandise contains hydrogen obtained from sulphuric acid does not preclude it from being a derivative of crude petroleum.

It is evident that the naphthenic acid here could not have been produced without the use of crude petroleum. Appellant, citing *In re Matheson*, 49 Fed. 272, contends that one substance is not a derivative of another unless its determining characteristic is something which has been obtained therefrom; and that the determining characteristic of naphthenic acid is the hydrogen which was obtained from the sulphuric acid, since it is hydrogen "which makes of it an acid." However, in our opinion the most distinctive feature of the involved merchandise is not merely that it is an acid, but that it is naphthenic acid, and the substances which give it the latter characteristic are obtained from crude petroleum.

It is obvious that when one substance is not extracted bodily from another, but contains ingredients derived from two or more sources, the question whether it is a derivative of one of those sources may be a close one, and its determination will depend on the circumstances of the particular case involved. Under the circumstances of the instant case, we agree with the lower court that the merchandise is a derivative of crude petroleum. The decision appealed from is *affirmed*.

JACKSON, J., Retired, recalled to participate herein in place of COLE, J., absent because of illness.