# United States Court of Appeals
## For the First Circuit

No. 99-2061

UNITED STATES,

Appellee,

v.

VLADIMIR CABRERA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Stahl, Circuit Judge,
Bownes, Senior Circuit Judge,
and Lynch, Circuit Judge.

James T. McCormick for appellant.
Donald C. Lockhart, Assistant United States Attorney, with
whom Stephanie S. Browne, Assistant United States Attorney and
Margaret E. Curran, United States Attorney, were on brief for
appellee.

April 5, 2000

**STAHL, <u>Circuit Judge</u>**.  Defendant-appellant Vladimir Cabrera appeals his conviction for possession of a document-making implement under 18 U.S.C. § 1028 (1994 & Supp. 1996). Specifically, he (a) asserts that under a proper interpretation of § 1028, the prosecution presented insufficient evidence upon which to ground a conviction and (b) challenges the district court's decision to limit the scope of cross-examination of a particular government witness.  We affirm.

## Background

In early 1998, Cabrera and an accomplice, Joseph Medeiros, engaged in a scheme to produce counterfeit identification documents, including Massachusetts and Rhode Island driver's licenses, Massachusetts and Rhode Island state employee identification cards, Rhode Island and Puerto Rico birth certificates, U.S. Department of Health and Human Services Social Security cards, and U.S. Department of Justice Immigration and Naturalization Service ("INS") Resident Alien cards.  The government's evidence supported the conclusions that Cabrera employed a computer, a document scanner, a printer, and commercial software that together could be used to scan, alter, and reproduce documents.  When used in conjunction with this hardware and software, computer files containing previously scanned official documents stripped of all identifying material

-3-

served as digitized "templates" from which forgeries could easily be fabricated. First, using the aforementioned equipment, Cabrera scanned genuine documents into his computer, saved the images on his computer hard drive and on floppy disks, removed or altered the identifying information and photographs on the documents, and then printed the documents on photographic paper. Medeiros then inserted new identifying information onto the documents, trimmed the counterfeits, and laminated them as appropriate. Cabrera kept the computer equipment at his home, while the equipment Medeiros used was stored in a suitcase that the two owned jointly.

On June 10, 1998, U.S. Secret Service Agents searched Cabrera's apartment pursuant to a warrant. They found Cabrera's computer equipment, a board used for measuring and trimming documents, Microsoft's "Picture It!" software, which Cabrera apparently had used to create the counterfeit materials, the digitized templates, and sundry fake documents in various stages of completion.

Subsequently, on January 20, 1999, a federal grand jury in the District of Rhode Island returned a two-count indictment, charging, inter alia, that Cabrera possessed document-making implements with the intent that such implements be used in the production of false identification documents, in violation of 18

U.S.C. § 1028(a)(5). At the relevant time period, the statute defined "document-making implement" to mean

> any implement or impression specially designed or primarily used for making an identification document, a false identification document, or another document-making implement.[1]

Count One -- the only count relevant to this appeal[2] -- was based on Cabrera's possession of the computer, printer, and scanner.

During Cabrera's trial, Secret Service Agent James Mooney testified for the government regarding the templates found on Cabrera's hard drive and on the diskettes. Agent Mooney also described the software installed on Cabrera's computer and how it could be used for scanning, altering and reproducing documents. On cross-examination, Agent Mooney acknowledged that computers were available to the public and that they had uses aside from those of which Cabrera stood accused. But when Cabrera's counsel then attempted to further

---

[1]This language has since been amended and now defines "document-making implement" as "any implement, impression, electronic device, or computer hardware or software, that is specifically configured or primarily used for making an identification document, a false identification document, or another document-making implement." 18 U.S.C. § 1028(d)(1) (1994 & Supp. 1998) (as amended).

[2]Cabrera was acquitted on a second count involving the possession of rub-on letters, a laminating machine, and plastic laminating pouches.

examine him regarding the general uses to which anyone could put computer equipment, the court intervened, and the following sidebar exchange regarding the meaning of § 1028's "primarily used" prong ensued:

> THE COURT: Congress might have been a little bit more precise in their definition, but as I read that definition in the context of this statute, I read it as referring to the possession and the intent of the possessor in putting it to use.  So I think that the general use that anyone might put a computer to -- in this case, a computer to, is not relevant.
>
> . . . .
>
> MR. McCORMICK [Cabrera's Counsel]: I wanted to ask generally if [computer equipment] was primarily used for the making of --
>
> THE COURT: No, because that primarily refers to the possession of this individual, not the general public.
>
> At the trial's close, the district court instructed the

jury only that:

> [a]s used in these instructions, the term "document making implement" means any implement or impression specially designed or primarily used for making an identification document, a false identification document or another document making implement.

The instructions did not specify any particular meaning for the terms "specially designed" or "primarily used."  Although Cabrera's counsel did not object to these instructions, the

government <u>did</u> object, stating that they did not adequately specify that the statute referred to Cabrera's primary use of the equipment rather than the general uses to which any computer user primarily would put such equipment.

Meanwhile, Cabrera had moved for judgment of acquittal on both counts, arguing that "on the evidence presented, it ha[d] not been shown that the computer, printer and scanner referred to in the indictment [we]re document making implements." The district judge reserved judgment on the motion. On May 21, 1999, the jury convicted Cabrera on Count One, and the district judge denied his motion for a judgment of acquittal on that count. Cabrera appeals.

## Discussion

We address, in turn, the sufficiency of the evidence supporting Cabrera's conviction and the district court's decision to curtail Cabrera's cross-examination of Agent Mooney. Both issues turn on the interpretation of former 18 U.S.C. § 1028.

## I. Sufficiency of the Evidence

Cabrera argues first that his computer system was not proven to constitute a document-making implement within the meaning of the statute, because "there was no proof, either directly [sic] or by inference, that [it] was . . . specially

-7-

designed or <u>generally</u> used to produce identification documents, false identification documents or other document making implements." (Emphasis added.)  To determine the sufficiency of the evidence, we "canvass the evidence (direct and circumstantial) in the light most agreeable to the prosecution and decide whether that evidence, including all plausible inferences extractable therefrom, enables a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime."  <u>United States</u> v. <u>Noah</u>, 130 F.3d 490, 494 (1st Cir. 1997).

## A.  <u>"Specially Designed"</u>

We first find that Cabrera's computer system was "specially designed" for the production of identification documents.  As an initial matter, we hold that the statute's text is unambiguous.  It does not exclude from its reach implements that could have legitimate other uses if not altered by the perpetrator's modifications.  Cabrera suggests that the "specially designed" prong refers not to a defendant's specific implements, but to implements that <u>as a class</u> are uniquely configured to fabricate false identification documents.  His interpretation is not tenable.  Neither the statute nor Cabrera provides any basis upon which a court could determine the proper level of generality at which to define the class.  Should we

-8-

look to the class of "computers fitted with scanners, printers, document-altering software and digitized templates"?  The class of all "computers"?  All "electronic implements"?  All "implements" of any sort?  Nothing in § 1028 requires such arbitrary classification.  Rather, the statute unambiguously asks the fact-finder to consider whether the item <u>that the defendant is charged with possessing</u> was "specially designed" for producing forgeries.

Asserting that the statute is ambiguous, Cabrera notes that courts may look to a statute's legislative history when its language itself is not conclusive and clear.  <u>See, e.g.</u>, <u>Burlington Northern R.R. Co.</u> v. <u>Oklahoma Tax Comm'n</u>, 481 U.S. 454, 461 (1987); <u>Arnold</u> v. <u>United Parcel Serv., Inc.</u>, 136 F.3d 854, 858 (1st Cir. 1998).  But even if § 1028 were unclear (and we believe it is not) Cabrera's resort to its legislative history would be unavailing.  The House Judiciary Committee's report on the False Identification Crime Control Act of 1982 -- in which the disputed "specially designed" language was first introduced -- stated that "the committee intend[ed] to exclude implements such as office photocopying machines, which are designed for more general and legitimate purposes."  H.R. Rep. No. 97-802, at 11 (1982), <u>reprinted in</u> 1982 U.S.C.C.A.N. 3519, 3530.  This language might support an argument that standard

computer equipment, bereft of any special-purpose hardware or software, would fall beyond the statute's reach. Perhaps an offender could, it would seem, have used an ordinary word processor and an ordinary printer with ordinary paper to produce false documents, just as an offender could have used an office photocopier to do so, without having violated former § 1028. But Cabrera's computer arrangement, unlike a standard office photocopier, was specifically designed to facilitate counterfeiting. A modern computer is not analogous to an "office photocopying machine[]" circa 1982, which in Congress's view likely could not be altered or specialized, but rather to a modern photocopier fitted with software and hardware that render it uniquely suited to produce illicit materials. We have no reason to believe that such a device would escape § 1028's reach simply because both it and its 1982 analogue were called "photocopiers." A photocopier configured with special-purpose hardware or software may be "specially designed" for the fabrication of identifying documents, and so may a similarly configured computer.

In fact, the more relevant portion of the legislative history is that which precedes the language quoted above. The House committee report noted that the term "document-making implement" would include "text in a distinctive type face and

layout that when reproduced [is] part of an identification document." Id. This statement, of course, accurately describes the templates, which were merely computer files containing digital images of "text in a distinctive type face and layout." Alone, each template formed "part of an identification document" and together with the inserted data, each would constitute a complete document.

Cabrera contends that his system was not specially designed for the fabrication of false identification documents, emphasizing that the hardware at issue -- namely, the computer, printer, and scanner -- were not uniquely suited to such activity. However, the evidence adduced at trial permitted a jury to conclude that Cabrera's system also included software, such as the "Picture It!" program, which testimony indicated "could be used . . . to accept scann[ed] images and also to place those images onto computer-produced documents." Most tellingly, the system also included digitized templates of various official identification documents stored on Cabrera's hard drive and floppy disks. A jury viewing this paraphernalia as a whole could reasonably have deemed the system "specially designed . . . for making . . . a false identification document."

### B. **"Primarily Used"**[3]

Cabrera urges that the "primarily used" prong of the "document-making implement" definition refers to an item's "general usage" rather than the particular use to which a defendant put it. The government acknowledges that if it was required to prove that as a general matter, computers, scanners, and printers are primarily used for making identification documents or false identification documents, Cabrera's conviction must be overturned because the court was presented with no evidence supporting that conclusion. The government contends, however, that the relevant inquiry focuses not on the uses of some hypothetical user, but on Cabrera's own primary use of the computer system. We share the government's view, and find that a jury reasonably could have found that Cabrera's equipment was "primarily used" for the fabrication of documents as that term is set forth in former § 1028.

First, as the government notes, Congress could have used a word such as "generally" in lieu of "primarily" if it intended the meaning that Cabrera proposes. Congress's choice

---

[3]Judge Lynch agrees with the foregoing analysis regarding the "specially designed" prong. She also believes that a jury reasonably could have convicted Cabrera under the "primarily designed" prong, but would employ a standard different from that posited below. Thus, she joins the opinion to this point, as well as Part II and the opinion's conclusion, but declines to join this section.

not to use that term suggests that it did not intend the inquiry to focus on an item's typical use within society. Relatedly, the section's legislative history suggests that Congress fully expected § 1028 to cover implements that were "generally" used for purposes other than the fabrication of documents. The House Judiciary Committee report noted that "specialized paper or ink" could constitute document-making implements under the "primarily used" prong. H.R. Rep. No. 97-802, at 11, reprinted in 1982 U.S.C.C.A.N. at 3530. Paper and ink -- even "specialized" paper and ink -- are not "generally" used for the production of false identification documents, but could, in a given case, be "primarily used" in the service of such ends by a particular defendant. The committee's remarks, then, lend credence to the government's case-specific interpretation of the "primarily used" prong.

Moreover, the treatment which former § 1028 has been accorded by the courts suggests that "primarily used" refers to the defendant's primary use of the item in question. While no court appears to have analyzed the meaning of this prong, it has been found to encompass an assortment of paraphernalia not "generally" used for illicit purposes, including laminating machines, plastic laminating pouches, packets of rub-on letters, erasers, tape, scissors, and small photographs. See, e.g.,

United States v. Castellanos, 165 F.3d 1129, 1130 (7th Cir. 1999); United States v. Pearce, 65 F.3d 22, 24-26 (4th Cir. 1995).

Finally, as the government points out, at least one other statute with language similar to § 1028's has been treated in a manner consistent with the government's position here. The statute prohibiting fraud in connection with an "access device" addresses, inter alia, "device-making equipment," and defines that term to mean "any equipment, mechanism, or impression designed or primarily used for making an access device or a counterfeit access device." 18 U.S.C. § 1029(e)(6) (1994 & Supp. 1998) (emphasis added). The Eleventh Circuit, in applying this statute, examined whether a defendant's mobile phone was primarily used to make an access device or a counterfeit access device. See United States v. Morris, 81 F.3d 131, 132-34 (11th Cir. 1996). Although the court ultimately found that it was primarily used by the defendant for making telephone calls and that it therefore did not fall within the ambit of § 1029(e)(6), the court's very pursuit of the inquiry reflected its belief that what mattered was the particular use to which the defendant put the device, not its "general" use within society. See id.

The evidence showed that Cabrera repeatedly used his computer, scanner, printer, software, and digitized templates to create false identification documents. This system was used in conjunction with laminates, Exacto blades, a supply of photographic-quality paper, and genuine identification documents. There was no evidence to demonstrate that Cabrera used his system for any <u>other</u> purpose. The jury thus reasonably could have found that this equipment was "primarily used" for Cabrera's document production.

## II. <u>Curtailment of Agent Mooney's Cross-Examination</u>

Cabrera also challenges the district court's refusal to allow his attorney to cross-examine Mooney regarding the "primary use" to which other individuals generally put computers. In view of the preceding ruling, this testimony would have been irrelevant, and therefore inadmissible. <u>See</u> Fed. R. Evid. 401; Fed. R. Evid. 402. "We generally will reverse a district court's admissibility determinations under Federal Rule[] of Evidence 402 . . . only in extraordinarily compelling circumstances." <u>United States</u> v. <u>Rosario-Diaz</u>, 202 F.3d 54, 70 (1st Cir. 2000). No such circumstances warrant reversal here.

## <u>Conclusion</u>

For the reasons stated herein, we **AFFIRM** Cabrera's conviction.