# United States Court of Appeals

## For the First Circuit

---

Nos. 03-2274 & 03-2275

UNITED STATES OF AMERICA,

Appellant/Cross-Appellee,

v.

WALTER L. LACHMAN, MAURICE H. SUBILIA, JR.,
FIBER MATERIALS, INC., MATERIALS INTERNATIONAL, INC.,

Defendants-Appellees/Cross-Appellants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Douglas P. Woodlock, U.S. District Judge]

---

Before

Selya, Dyk[*], and Howard, Circuit Judges.

---

James D. Herbert, Assistant United States Attorney, with whom
Michael J. Sullivan, United States Attorney, Despena F. Billings,
Assistant United States Attorney, and Stephan E. Oestreicher were
on brief for appellant/cross-appellee.
Michael R. Schneider with whom Andrew Good, Matthew Zisow, and
Alan M. Dershowitz were on briefs for defendant-appellees/cross-
appellants.

---

October 25, 2004

---

[*]Of the Federal Circuit, sitting by designation.

**DYK, Circuit Judge**. The issue on the government's appeal is whether the term "specially designed" as used in 15 C.F.R. § 399.1, Supp. 1 (1988) (now 15 C.F.R. § 774, Supp. 1 (2004)), is unconstitutionally vague.

Defendants Walter L. Lachman, Maurice H. Subilia, Jr., Fiber Materials, Inc. ("FMI"), and Materials International, Inc., were convicted in the United States District Court for the District of Massachusetts on charges of violating and conspiring to violate the Export Administration Act of 1979, Pub. L. 96-72, 93 Stat. 503 (codified at 50 U.S.C. app. § § 2401-2420 (2000)) ("EAA"), and its implementing regulations.[1] The alleged violation consisted of exporting a control panel for a hot isostatic press ("HIP") without the necessary export license required by the EAA and its regulations. The question under the regulation was whether the control panel was "specially designed" for use with an embargoed HIP. See 15 C.F.R. § 399.1, Supp. 1 (1988).

After trial, the district court granted a motion for acquittal notwithstanding the verdict, pursuant to Federal Rule of Criminal

---

[1] The EAA expired in 1994, was briefly renewed by Congress in 2000, and expired again in 2001. See 50 U.S.C. app. § 2419. Its provisions have been carried forward by executive order under the authority of the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq. See 59 Fed. Reg. 43437 (Aug. 23, 1994); 66 Fed. Reg. 44025 (Aug. 22, 2001); 67 Fed. Reg. 53721 (Aug. 16, 2002); 68 Fed. Reg. 47833 (Aug. 11, 2003); 69 Fed. Reg. 48763 (Aug. 6, 2004). The defendants do not make any argument that the EAA and its regulations are inapplicable due to the expiration of the original statute.

Procedure 29(c), on the ground that the EAA regulation and, in particular, the term "specially designed" as used in the regulation, was unconstitutionally vague. <u>United States</u> v. <u>Lachman</u>, 278 F. Supp. 2d 68 (D. Mass. 2003). We hold that the applicable EAA regulation was not unconstitutionally vague and, accordingly, vacate the judgment of acquittal. With respect to the defendants' cross-appeal, we remand to the district court to rule on the defendants' conditional motion for a new trial in light of our construction of the statute and our decision on the vagueness issue.

I.

A.

The EAA is designed "to restrict the export of goods and technology which would make a significant contribution to the military potential of any other country . . . which would prove detrimental to the national security of the United States." 50 U.S.C. app. § 2402(2)(A). The EAA requires exporters to obtain a "validated license" before exporting commodities listed in the regulations promulgated by the Secretary of the Department of Commerce ("Commerce"). <u>Id.</u> § 2403(a). Commerce's regulations themselves include similar license requirements. <u>See generally</u> 15 C.F.R. § 372.1 (1988). It is a criminal offense to knowingly violate or conspire to violate the EAA or its regulations. 50

-3-

U.S.C. app. § 2410(a).  Willful violations incur an even greater

penalty.  Id. § 2410(b).

Commerce has promulgated a "Control List" of all commodities

subject to export controls under the EAA and requiring a valid

license for export.  Id. §§ 2403(b), 2404(c)(1).[2]  Our concern is

with the Control List as it existed in 1988.  In the 1988 Control

List[3] each regulated commodity was assigned an Export Control

Classification Number ("ECCN"), indicating the commodity's

characteristics, its functions, the reasons for its control, and

its export licensing requirements.  Commodities not listed were not

regulated by the EAA.  Although each exporter was responsible for

classifying its own goods, an exporter could request an advisory

opinion from Commerce's Bureau of Industry and Security regarding

whether a particular item was subject to regulation and, if so, its

appropriate ECCN classification.  15 C.F.R. § 748.3(a) (2004).

B.

The defendants in this case were charged with "knowingly and

willfully" violating and conspiring to violate the EAA and its

---

[2] This control list does not include commodities exclusively controlled for export by agencies other than the Department of Commerce.  15 C.F.R. § 738.1 (2004).

[3] The Commerce Control List was formerly known, between 1988-1991, as the Commodity Control List.  See 56 Fed. Reg. 42824 (Aug. 29, 1991).  The current version of the Control List is at 15 C.F.R. § 774, Supp. 1 (2004), while the version relevant at the time of the events at issue here may be found at 15 C.F.R. § 399.1, Supp. 1 (1988).  We refer in this opinion to the 1988 list.

-4-

regulations by exporting a HIP control panel to India "without having first obtained the required validated export license" from Commerce.  (J.A. at 88-89.)  The defendants admittedly did not request or secure an individual license.  The question is whether they were required to secure one.[4]

A HIP is a piece of "equipment capable of pressurizing a closed cavity . . . to create equal pressure in all directions within the cavity upon workpiece or material."  15 C.F.R. § 399.1, Supp. 1 (1988).  Material exposed to this process densifies, and, in particular, carbon/carbon material  "becomes suitable for use in rocket components, including ballistic missiles with nuclear capability."  Lachman, 278 F. Supp. 2d at 73.  In 1988, HIPs "possessing a chamber cavity with an inside diameter of 127 mm (5 inches) or more" (a "larger HIP") were covered by the Control List and assigned an ECCN 1312A classification.  15 C.F.R. § 399.1, Supp. 1 (1988).  A license was required for the export of larger HIPs and all "specially designed . . . components, accessories and controls therefor."  Id.  The reasons for control of such commodities were "[n]ational security [and] nuclear non-proliferation."  Id.

---

[4] If the export of a good does not require an individually validated license, then a general license usually attaches automatically. See generally, Lachman, 278 F. Supp. 2d at 72. For simplicity in the text we use the shorthand "license" to refer to the requirement for an individual license.

C.

The EAA and its implementing regulations were adopted against the background of an international regime for the control of strategic materials administered by the Coordinating Committee on Multilateral Export Controls ("COCOM"). See 50 U.S.C. app. § 2404(i). COCOM was a "multilateral organization that cooperated in restricting strategic exports to controlled countries."[5] 15 C.F.R. § 772.1 (2004). In particular, COCOM created "a list of strategic commodities which were to be embargoed for shipment to Communist Bloc countries" ("COCOM List"). Peter Swan, A Road Map to Understanding Export Controls: National Security in Changing Global Environment, 30 Am. Bus. L.J. 607, 619 (1992). "Recognizing the ineffectiveness of unilateral controls and the importance of uniform enforcement measures to the effectiveness of multilateral controls," the EAA mandated United States involvement in COCOM. See 50 U.S.C. app. § 2404(i). The EAA export control system was coordinated with the COCOM regime. For example, when the letter "A" appeared at the end of the ECCN for an item on the Control List, it indicated that the classification was "multilaterally controlled." 15 C.F.R. § 399.1(f)(2) (1988). The particular regulation involved here bore a letter designation "A," indicating that its source was the COCOM List.

---

[5] COCOM was officially disbanded on March 31, 1994. 15 C.F.R. § 772.1 (2004).

D.

In 1985 the defendants first contracted with the government of India to supply a HIP of 18 inch cavity diameter and a control panel.[6]  This contract was amended in January 1987 such that defendants would instead supply the Indian government with a HIP of 4.9 inch cavity diameter, which was unregulated.  On the same day as the amendment, however, defendant Subilia, President of FMI, signed a letter stating that the subsystems delivered with the 4.9 inch HIP, including the control panel, would have "added capacity . . . to provide for future expansion . . . to larger vessel size." In April of 1988, the defendants shipped a HIP with a 4.9 inch diameter cavity and an accompanying control panel.  Although the control panel could be used with a 4.9 inch HIP, it was designed so that it would also control a HIP with a diameter larger than 5 inches, i.e., one that was covered by the Control List.  In April of 1991, the defendants' engineers connected the control panel to a HIP with a diameter larger than 5 inches.  This larger HIP had been procured by the defendants from a third-party manufacturer in Switzerland.  There is no contention that a license was required for this larger HIP because it originated from Switzerland.

_____

    [6] The evidence set forth below was contested on a number of points.  On review from a judgment of acquittal, we evaluate the evidence in the light most favorable to the prosecution. United States v. Pimental, 380 F.3d 575, 584 (1st Cir. 2004).  The facts as stated are based on assumptions favoring the United States.

-7-

In 1993 the government charged the defendants with "knowingly and willfully conspir[ing] and agree[ing] with each other . . . to export and cause to be exported from the United States" the control panel, without the required license. The government argued that the control panel required a validated license because it qualified as "specially designed . . . accessories and controls" for an embargoed larger HIP.

At the trial, on the "specially designed" question, the government presented evidence that defendant Subilia had instructed FMI's engineers to base the control panel's design on that of a panel used to operate 20 inch HIPs. The government also presented evidence that the control panel which was exported had five heating zone controllers and that the 4.9 inch HIP defendants exported only had two heating zones. The government showed as well that the defendants had ordered a switch for the control panel, which permitted the disabling of three of the five heating zone controllers or alternatively the use of the panel with a unit with more than two heating zones.

There was also significant dispute regarding the legal meaning of the phrase "specially designed" in ECCN 1312A. This phrase appeared throughout the 1988 Control List, being used to describe the controlled items in more than 100 instances. The government contended that the term "specially designed" included all controls that were designed so that they could be used with regulated HIPs,

whether or not such controls could also be used with non-regulated HIPs.  See Lachman, 278 F. Supp. 2d at 74-75.  The defendants, on the other hand, argued that the term encompassed only those controls designed exclusively for use with an embargoed HIP.

"In reliance upon the . . . pre-trial affidavits regarding the Commerce Department's understanding of the meaning of 'specially designed' as used in ECCN 1312A (which . . . was consistent with a plain meaning definition of the term), and in the absence of any then compelling contrary evidence on this point," the district court rejected the defendants' request for an exclusive use jury charge.  Id. at 77.  Instead, the district court judge instructed the jury as follows:

> You should consider that an item or commodity is specially designed within the meaning of the regulation if it is designed for a special purpose. . . [which] does not mean designed for an exclusive purpose.  That is to say, you could have a . . . control that can run a 4.9 inch HIP and can also run a HIP over five inches.  It doesn't have to be exclusively for that. . . . [Y]ou can find that a control panel such as the one at issue here was specially designed for a [regulated HIP] even if you find that the panel could have been used for other purposes . . . so long as among the purposes for which it was designed was the intent to control a [regulated HIP] and it had the effective capacity to do so when it was shipped.[7]

---

[7]  Regarding the EAA's scienter requirement, the judge instructed the jury that in order to convict they had to find that each defendant here intentionally violated or conspired to violate a known legal duty or, in other words, that each knew that the control panel that we're talking about here that was being exported in April of 1988 required an individual validated license and, yet, knowing that, nevertheless, they undertook to export it

-9-

The defendants were convicted on all counts, and they timely filed a motion for acquittal notwithstanding the verdict or, in the alternative, for a new trial, pursuant to Rules 29(c) and 33 of the Federal Rules of Criminal Procedure. The defendants' motion argued (1) that the jury instructions erroneously defined "specially designed"; (2) that ECCN 1312A was void for vagueness; (3) that the defendants were deprived of a fair trial because expert testimony regarding the definition of "specially designed" was not admitted, and (4) that there was insufficient evidence to find (a) that the defendants violated a known legal duty or conspired to violate the export laws, (b) that the control panel "was a 'control' within the meaning of ECCN 1312A," (c) that the control panel "could effectively control a large HIP within the meaning of the court's definition of 'specially designed'," and (d) that the district of Massachusetts was an appropriate venue for the litigation. (J.A. at 474-99.)

---

without one. . . . [G]ood faith is a defense to this charge. If any one of the defendants under your consideration believed in good faith that he was acting properly, even if he was mistaken or he was negligent, or he acted through inadvertence, that defendant may not be found guilty.

Because neither side challenges this instruction on appeal, we have no occasion to consider whether the trial judge correctly stated the scienter requirements of the EAA. We reserved this same issue in our earlier decision in this case. United States v. Lachman, 48 F.3d 586, 594 (1st Cir. 1995). See generally United States v. Shetterly, 971 F.2d 67, 73 (7th Cir. 1992).

In the course of post-trial proceedings, with few exceptions (noted below), both the defendants and the government relied exclusively on non-public sources to support their differing interpretations of "specially designed" and the vagueness issue. The defendants' post-trial submissions included new internal COCOM documents as well as new affidavits of former and current Commerce officials, supporting the contention that "specially designed" was understood to mean exclusively designed.

The most central of the defendants' post-trial submissions were the official minutes of a 1975 COCOM meeting, which the defendants had obtained in connection with another trial in Germany. These meeting minutes addressed "machines specially designed for making gas turbine blades" and "machines specially designed for the manufacture of jet engines." Lachman, 278 F. Supp. 2d at 81 (internal alterations omitted). To a large extent, the minutes reflected the United States delegation's statements that "it was standard practice in the context of [the COCOM List] to make use of the term 'specially designed' and that [COCOM] had resorted to it in a number of cases when it had been difficult to define exactly the equipments it was desired to embargo" and that the term was used to mean "an equipment used solely for a particular purpose." Id.

In light of the post-trial submissions, the district court granted the defendants' motion for acquittal notwithstanding the

verdict.  The district court concluded that the definition of "specially designed" that it used in charging the jury was "fundamentally wrong."  Id. at 89.  It held that the term was ambiguous and that Commerce had employed "a number of competing interpretations for the term 'specially designed' in ECCN 1312A."  Id. at 90.  Emphasizing that Commerce bore the responsibility to settle on one interpretation of the term, the court explained that Commerce "has yet to meet that obligation with respect to ECCN 1312A sufficiently for purposes of criminal prosecution."  Id.

The court then considered whether ECCN 1312A was void for vagueness in all its applications.  On this question, the court held that the regulation failed to give constitutionally sufficient notice and to meet the obligation of fair enforcement.  The court concluded that although it had "no doubt . . . that the defendants here sought — for their own private economic advantage and heedless of the national security interest of this country — to exploit imprecision in the regulatory regime for controlling exports," it could not sustain the conviction "in the face of the defendants' adequately developed void-for-vagueness challenge."  Id. at 97.  The district court failed to rule on the defendants' motion for a new trial.[8]

---

[8] The trial judge denied a separate motion for a new trial brought by one defendant on the ground that the trial court failed to make an inquiry about a potential conflict of interest. Lachman, 278 F. Supp. 2d at 70 n.1.

The government timely appealed the post-trial judgment of acquittal, and the defendants cross-appealed the district court's failure to issue a conditional ruling on their new trial motion as required by Rule 29(d)(1).[9]

## II.

The defendants raise a challenge to the jurisdiction of this court that we must consider before addressing the merits of the government's appeal. The first paragraph of the Criminal Appeals Act, dealing with the dismissal of indictments, allows government "appeals whenever the Constitution would permit." United States v. Wilson, 420 U.S. 332, 337 (1975); see 18 U.S.C. § 3731 (2000). The defendants argue that the government's appeal should be dismissed because the Double Jeopardy Clause prohibits the government from appealing the district court's judgment of acquittal. We disagree.

The defendants argue that had the COCOM minutes been admitted before the jury verdict, the trial judge would have granted them a pre-verdict judgment of acquittal that would have been unappealable under Burks v. United States, 437 U.S. 1 (1978). The defendants contend that the government should not be able to transform an unappealable pre-verdict acquittal into an appealable post-verdict acquittal simply by unlawfully withholding exonerative evidence.

---

[9] As noted above, the case has previously appeared in this court on an interlocutory appeal by the government. This court held that the trial judge did not abuse his discretion in excluding 13 government exhibits. Lachman, 48 F.3d at 594.

The defendants misunderstand the holding of <u>Burks</u> and the trial judge's acquittal in this case. In <u>Burks</u>, the Court of Appeals for the Sixth Circuit had vacated a conviction because the evidence had been insufficient to convict. The court of appeals then remanded to the district court with instructions to consider whether to enter a judgment of acquittal or order a new trial. The Supreme Court held that these remand instructions were improper. The district court was required to enter a judgment of acquittal because the "appellate reversal mean[t] that the government's case was so lacking that it should not have even been <u>submitted</u> to the jury. Since we necessarily afford absolute finality to a jury's <u>verdict</u> of acquittal--no matter how erroneous its decision--it is difficult to conceive how society has any greater interest in retrying a defendant when, on review, it is decided as a matter of law that the jury could not properly have returned a verdict of guilty." <u>Id.</u> at 16 (emphasis in original).

However, <u>Burks</u> explicitly stated that "reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. . . . Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, <u>e.g.</u>, . . . incorrect instructions." <u>Id.</u> at 15; <u>see also</u> <u>United States</u> v. <u>Scott</u>, 437 U.S. 82, 96 (1978) ("Where the court, before the jury returns a

verdict, enters a judgment of acquittal pursuant to Fed. Rule Crim. Proc. 29, appeal will be barred only when 'it is plain that the District Court . . . evaluated the Government's evidence and determined that it was legally insufficient to sustain a conviction.'" (quoting United States v. Martin Linen Supply Co., 430 U.S. 564, 572 (1977)). Thus the Court stated in Lockhart v. Nelson, 488 U.S. 33 (1988), that Burks bars retrial only when an acquittal is based "on the sole ground that the evidence was insufficient to sustain the jury's verdict." Id. at 39.

The defendants appear to argue that even if the issue of constitutional vagueness is an issue of law, it depends on underlying findings of historical fact. We do not view Burks and its progeny as holding that the Double Jeopardy Clause is implicated by such fact-finding. The bar of Double Jeopardy attaches only where the acquittal involves "a resolution, correct or not, of some or all of the factual elements of the offense charged." Martin Linen, 430 U.S. at 571 (emphasis added).

The trial judge here found that the regulation was unconstitutionally vague. This is a legal determination that is independent of the sufficiency of evidence. Declaring that the regulation is unconstitutionally vague is not a "decision to the effect that the government has failed to prove its case." Burks, 437 U.S. at 15. The district court's historical fact findings here, even if pertinent to the constitutional issue, are irrelevant

-15-

to the "elements of the offense charged." Martin Linen, 430 U.S. at 571.  Because the judgment of acquittal was based on the legal conclusion of a constitutional defect in the regulation, we have jurisdiction to review the judgment of acquittal.

## III.

On the merits, we consider whether the district court properly granted the defendants' motion for a judgment of acquittal based on a legal determination that ECCN 1312A is void for vagueness.  The determination that a regulation is unconstitutionally vague is reviewed without deference.  United States v. Hussein, 351 F.3d 9, 14 (1st Cir. 2003).  This review requires us to decide two questions:  first, we must construe the meaning of the term "specially designed" in ECCN 1312A.[10]  Second, we must determine

---

[10] Contrary to the government's contention, United States v. Cabrera, 208 F.3d 309 (1st Cir. 2000), does not decide the interpretation of the term "specially designed" in a dual use situation, even under the statute in Cabrera.  In Cabrera the defendant was convicted of possessing a document-making "implement or impression specially designed or primarily used for making . . . a false identification document," in violation of 18 U.S.C. § 1028(a)(5).  Id. at 311.  The defendant in Cabrera argued that his computer, printer and scanner were not uniquely suited to making false identification documents.  In rejecting this argument, the court merely noted that "the system also included digitized templates of various official identification documents," and that a "jury viewing this paraphernalia as a whole could reasonably have deemed the system specially designed for making a false identification document."  Id. at 313-14 (internal quotations and alterations omitted).  Nothing in Cabrera indicates one way or the other whether "specially designed" encompasses an exclusive use or a multiple use definition.  Nor do we find the Supreme Court's decision in Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 501 (1982), finding the phrase

-16-

whether the regulation is void for vagueness under the construction we have adopted.

A.

1.

We begin our analysis with the language of ECCN 1312A.  See Williams v. Taylor, 529 U.S. 420, 431 (2000).  "The Supreme Court has repeatedly emphasized the importance of the plain meaning rule, stating that if the language of a statute or regulation has a plain and ordinary meaning, courts need look no further and should apply the regulation as it is written."  Textron Inc. v. Comm'r, 336 F.3d 26, 31 (1st Cir. 2003) (citing Comm'r v. Soliman, 506 U.S. 168, 174 (1993); United States v. Ron Pair Enters., 489 U.S. 235, 241-42 (1989); Gitlitz v. Comm'r, 531 U.S. 206, 220 (2001)).

Dictionaries of the English language are a fundamental tool in ascertaining the plain meaning of terms used in statutes and regulations.[11]  See, e.g., Carey v. Saffold, 536 U.S. 214, 219-20 (2002); see also Textron, 336 F.3d at 32.  The first definition of "special" provided by Webster's Third New International Dictionary is "distinguished by some unusual quality."  Webster's Third New International Dictionary of the English Language 2186 (3d ed. 1961)

---

"designed . . . for use" not to be unconstitutionally vague, instructive in construing the term "specially designed."

[11] For this purpose we look to dictionaries in use prior to or contemporaneous with the enactment of the statute or regulation.  See Lamar v. United States, 241 U.S. 103, 113 (1916).

-17-

(1986 prtg.) ("Webster's Dictionary"). The Oxford English Dictionary includes a definition of "special" as "[m]arked off from others of the kind by some distinguishing qualities or features." 9 A New English Dictionary 542 (Oxford 1919 & Supp. 1986) ("Oxford English Dictionary"). These definitions support the government's position because the control panel at issue had distinguishing features that rendered it suitable for the larger HIP. On the other hand, there are alternative definitions of "special" that tend to support the defendants' narrower construction of "specially designed." For example, Webster's Dictionary provides definitions such as "3a: relating to a single thing or class of things," Webster's Dictionary at 2186, and the Oxford English Dictionary includes definitions such as "affecting or concerning a single . . . thing" and "[h]aving close, intimate or exclusive connexion or relationship with one . . . thing (or set of these)," Oxford English Dictionary at 542. The definitions of "design" are more uniform. Webster's Dictionary provides such definitions as "to create, fashion, execute, or construct according to plan" and "to plan or produce with special intentional adaptation to a specific end." Webster's Dictionary at 611.

The dictionaries thus support two different definitions of "specially designed": (1) a broader definition encompassing items designed with properties that enable them to be used for a particular purpose, but capable of use for other purpose as well,

and (2) a narrower definition encompassing only items designed exclusively for a certain purpose.  In interpreting statutes we must adopt the definition most consistent with the statute's purpose.  See, e.g., Holloway v. United States, 526 U.S. 1, 9 (1999) (noting that "statutory language should be interpreted consonant with 'the provisions of the whole law, and . . . its object and policy'" (quoting John Hancock Mut. Life Ins. Co. v. Harris Trust and Sav. Bank, 510 U.S. 86, 94-95 (1993))); Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 608 (1979) ("As in all cases of statutory construction, our task is to interpret the words of these statutes in light of the purposes Congress sought to serve."); Kokoszka v. Belford, 417 U.S. 642, 650 (1974); see also Gen. Dynamics Land Sys., Inc. v. Cline, 124 S. Ct. 1236, 1245 (2004) (interpreting the Age Discrimination in Employment Act of 1967 "in light of the statute's manifest purpose"); Johnson v. United States, 529 U.S. 694, 710 n.10 (2000) ("Our obligation is to give effect to congressional purpose so long as the congressional language does not itself bar that result.").  We also construe a regulation in light of the congressional objectives of its underlying statute.  See McCuin v. Sec'y of Health & Human Services, 817 F.2d 161, 174 (1st Cir. 1987).  We must therefore look to the purpose of the EAA to determine which definition of "specially designed" is most consistent with the intent of Congress.

The goals of Congress in enacting the EAA are not difficult to ascertain.  The EAA itself begins with an expansive description of "Congressional findings" and continues with an even longer section devoted to "Congressional declaration of policy."  These provisions make clear that the EAA was designed to ensure that exports do not detrimentally affect the national security of the United States, while not unduly restricting legitimate trade and, in particular, United States exports.  50 U.S.C. app. § 2401.  The act repeatedly emphasizes that "[e]xport of goods or technology without regard to whether they make a significant contribution to the military potential of individual countries or combinations of countries may adversely affect the national security of the United States," id. § 2401(5); see also id. §§ 2401(8), 2402(9).  ECCN 1312A specifically states "[n]ational security" as the reason for control of HIPs.  See 15 C.F.R. § 399.1, Supp. 1 (1988).  The EAA also explains that the "ability of the United States citizens to engage in international commerce is a fundamental concern."  50 U.S.C. app. § 2401(1).

The EAA's concern for national security is of acute relevance in this case.  The term "specially designed" appeared more than 100 times on the Control List in 1988 and represents a fundamental concept used in export control.  Given the depth of concern for national security in the EAA, it would hardly serve this statutory

purpose to adopt a definition of "specially designed" that excludes any item designed for use with embargoed commodities but capable of use with commodities that were not embargoed. An item "specially designed" to activate or complete an embargoed commodity can "make a significant contribution to the military potential" of another country and threaten "the national security of the United States," irrespective of whether it is also capable of interacting with non-embargoed items. An exclusive use definition would permit easy evasion of the regulation through the deliberate design of items that implicate national security concerns so that they have both permitted and prohibited uses. This is clear from the very facts of this case, where the exported control panel with dual capabilities was attached by the defendants to an embargoed HIP in India. Thus, statutory and regulatory concerns with national security cannot be achieved if the regulation is construed to allow the exportation of controls designed to be used with embargoed commodities so long as they had other potential uses. See Holloway, 526 U.S. at 9 (rejecting the defendant's construction because it "would exclude from the coverage of the statute most of the conduct that Congress obviously intended to prohibit").

We conclude that this central purpose of the EAA requires us to construe "specially designed" in the regulation to include controls designed to be used with regulated HIPs even though they are capable of use with non-regulated HIPs. A device is "specially

-21-

designed" for use with an embargoed commodity if it is intentionally created for use, and in fact capable of being used, with the embargoed commodity. At the same time, this definition does not extend the embargo to devices simply because they could in theory be used with embargoed commodities, thus ensuring that legitimate exports are not prohibited.[12]

3.

The defendants raise a number of arguments against adopting the forgoing construction of the term "specially designed." In a letter submitted under Rule 28(j) of the Federal Rules of Appellate Procedure, they argue "that 'specially designed' in ECCN 1312A must be construed as a 'technical term of art' derived from Department of Commerce and COCOM custom and usage, and not from a plain dictionary meaning." The defendants maintain that an exclusive use definition of "specially designed" is evidenced by affidavits of former regulators and industry participants regarding the export

---

[12] Because we find the statute and regulation clear in light of their declared purpose, the rule of lenity does not apply. See Reno v. Koray, 515 U.S. 50, 64-65 (1995) ("The rule of lenity applies only if, after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended." (internal quotations and citations omitted)).

industry's understanding of the term.[13]  We do not find these sources persuasive.

To be sure, there are instances where a statutory or regulatory term is a technical term of art, defined more appropriately by reference to a particular industry usage than by the usual tools of statutory construction.  See, e.g., McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 342 (1991); La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 371-372 (1986); Corning Glass Works v. Brennan, 417 U.S. 188, 201-02 (1974).  Thus it is well-settled, for example, that "in the interpretation of the revenue laws, words are to be taken . . . according to their commercial designation, if that differs from the ordinary understanding of the word." Lutz v. Magone, 153 U.S. 105, 107 (1894).  However, this canon of construction requires the disputed term to actually be a technical term of art.  Thus, the Court in Greenleaf v. Goodrich, 101 U.S. 278, 284-85 (1879), held that although "the commercial designation of an article among traders and importers . . . fixes its character for the purpose of the tariff laws[,] . . . [t]he phrase 'of similar description' is not a commercial term."  There has been no showing that the term "specially designed" has a technical meaning

---

[13]  See, e.g., J.A. at 613 (affidavit of former Commerce official stating that "specially designed" meant parts, components, accessories or controls "were peculiar to and solely used" with the embargoed item); J.A. at 517 (affidavit of former consultant to exporters stating that "specially designed" covered "components which could be used with an 'export controlled' item and no other.").

in a relevant industry.  Rather, the defendants have submitted as evidence statements as to the common legal interpretation of the term in 1988.  This is not the same as identifying a technical term of art.[14]

Second, while the defendants appear to recognize that the regulation should not be construed based on an agency's informal non-public understanding, the district court, in reaching the interpretation reflected in the jury instructions relied on evidence concerning the agency's internal understanding of the regulation.  The defendants now call our attention to post-trial affidavits that suggest Commerce officials within the agency internally gave the term a contrary interpretation and affidavits as to statements made by Commerce officials at industry seminars also suggesting a contrary interpretation.  These views of Commerce officials are simply irrelevant to our interpretive task.  Agencies do have an important role to play in the interpretation of statutes and regulations under Chevron and related doctrines.  See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984); United States v. Cleveland Indians Baseball Co., 532 U.S.

_____

[14] There is another canon of construction that if Congress uses a legal term of art in a statute, "it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." Morissette v. United States, 342 U.S. 246, 263 (1952).  However, this canon is not implicated here because there has been no showing that the regulation adopted a well-accepted and pre-existing legal understanding of the term "specially designed."

-24-

200, 220 (2001); Auer v. Robbins, 519 U.S. 452, 461 (1997). But we look to agency interpretations only when the statute or regulation remains ambiguous after we have employed the traditional tools of construction. See Chevron, 467 U.S. at 843 n.9 ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."); see also Gen. Dynamics, 124 S. Ct. at 1248 ("Even for an agency able to claim all the authority possible under Chevron, deference to its statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent."). Here, we have concluded that the regulation is not ambiguous when construed in light of the statutory purpose.

In any event, agency interpretations are only relevant if they are reflected in public documents. The Administrative Procedure Act, 5 U.S.C. § 551 et seq, provides that "agenc[ies] shall make available to the public . . . substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency." Id. § 552(a)(1)(D) (2000). So too, under Chevron, the Supreme Court has made clear that informal agency interpretations of statutes, even if public, are not entitled to deference. See generally United States v. Mead

<u>Corp.</u>, 533 U.S. 218 (2001). While this is not a situation involving the interpretation of a statute, the same requirements of public accessibility and formality are applicable in the context of agency interpretations of regulations. For example, in <u>Rumsfeld</u> v. <u>United Technologies Corp.</u>, 315 F.3d 1361, 1369 (Fed. Cir. 2003), the court held that testimony of former members of the Cost Accounting Standards ("CAS") board as to the understanding of the CAS regulations was irrelevant to the construction of those regulations. <u>See</u> <u>Chrysler Corp.</u> v. <u>Brown</u>, 441 U.S. 281, 302 (1979) ("Interpretive rules are issued by an agency <u>to advise the public</u> of the agency's construction of the statutes and rules which it administers." (emphasis added) (internal quotations and citations omitted)).

The non-public or informal understandings of agency officials concerning the meaning of a regulation are thus not relevant. The affidavits here of former and present agency officials as to the agency's non-public understanding of the regulation do not remotely satisfy the requirements of formality and public accessibility. The statements made by government officials at industry seminars (upon which the defendants also rely), although public, are also not the kind of formal agency statements that are entitled to deference.

Third, the defendants appear to argue that the term "specially designed" should be construed to be given the same meaning as is

used in the COCOM regime.  We recognize that statutory and regulatory language should be construed in consonance with international obligations when possible.  See, e.g., Weinberger v. Rossi, 456 U.S. 25, 32 (1982); Murray v. The Charming Betsy, 6 U.S. (2 Cranch) 64, 118 (1804).  We also recognize that the EAA itself envisions overlap with COCOM, see 50 U.S.C. app. § § 2404(i), 2402(3), and ECCN 1312A was transposed from the COCOM Annex, see 15 C.F.R. § 799.1(b)(4) (1992).  However, the COCOM List does not define the term "specially designed."  Rather, the defendants point to Commerce officials' statements regarding the commonly understood definition at COCOM and to statements by the United States delegation during COCOM meetings.  These sources suffer from the same shortcoming as the defendants' evidence addressing the common understanding at Commerce.  They do not reflect publicly communicated or publicly accessible definitions.  In fact, before the trial court the government insisted that the 1975 COCOM meeting minutes remain classified, and provided a redacted version to the court.  Lachman, 278 F. Supp. 2d at 80 n.18.

Finally, the defendants point to the definition of "specially designed" used in another source of United States export control, the Missile Technology Control Regime ("MTCR") Annex.  This definition, adopted in 1991, ostensibly supports the defendants' proposed definition of "specially designed" as it states in its "TERMINOLOGY" section that: "'Specially designed' describes

-27-

equipment, parts, components or 'software' which . . . have unique properties that distinguish them for certain predetermined purposes . . . [and] are not capable of producing other types of components." See http://www.mtcr.info/english/annex.html.  While this does not suffer from the same defects identified above, being both formal and public, we conclude that it is not relevant.

The MTCR was formed in 1987 as a "policy statement between the United States, the United Kingdom, the Federal Republic of Germany, France, Italy, Canada, and Japan . . . to restrict sensitive missile-relevant transfers based on the MTCR Annex."  22 C.F.R. § 120.29 (2004).  The MTCR Annex lists missile-related commodities, which MTCR members agree to control.  Control of MTCR Annex items is implemented through listing on the United States Munitions List pursuant to the Arms Export Control Act, 22 U.S.C. § 2797(a) (2000), and listing on the Control List pursuant to the EAA, 50 U.S.C. app. § 2405(l).  In 1991 when the "specially designed" definition was added to the MTCR Annex, Commerce included among its definitions applicable to its regulations for the "Commodity Control List and Related Matters," 15 C.F.R. § 799 (1992), the MTCR definition of "specially designed," id. § 799.1, Supp. 3.  This entry was listed as "*Specially designed* (MTCR context)."  Id.  The defendants argue that "specially designed" in the regulation here should be construed the same way.

We recognize that, generally, "[t]he normal rule of statutory construction assumes that 'identical words used in different parts of the same act are intended to have the same meaning.'" Sorenson v. Sec'y of the Treasury, 475 U.S. 851, 860 (1986) (quoting Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 87 (1934)); see also Gustafson v. Alloyd Co., 513 U.S. 561, 570 (1995). This rule applies equally to regulations. See Weaver v. United States Info. Agency, 87 F.3d 1429, 1436-37 (D.C. Cir. 1996). Nonetheless, this rule of construction is not applicable here. The MTCR Annex is not "a different part of" the EAA regulations. The MTCR Annex is not even published in the Code of Federal Regulations.

Most importantly, Commerce explicitly limited the applicability of this definition by listing the definition in the EAA regulations with the specific notation of "(MTCR context)." If anything, the explicit limitation of this definition to the "MTCR context" suggests that the exclusive use definition was a departure from Commerce's customary usage of the term, perhaps in order to achieve consistent usage among the various countries involved in the MTCR. This purpose, of course, would only have application to items on the control list marked "MT," which is not the case with ECCN 1312A.[15] See Gen. Dynamics, 124 S. Ct. at 1246 (rejecting the

---

[15] We also note that the MTCR definition did not exist during the time period of the export in question, specifically 1988, because it was added in 1991. See United States v. Price, 361 U.S. 304, 313 (1960) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.").

presumption of uniform usage because it conflicted with "the cardinal rule that statutory language must be read in context" (internal quotation and alterations omitted)).

In sum, we find no reason to reject the construction of the term "specially designed" that we glean from the text and purpose of the regulation.  The regulation "by its terms" prohibits exporting items specially designed to function with a larger HIP, whether or not designed exclusively for that purpose.

IV.

We next consider whether ECCN 1312A, as construed, is void for vagueness.  Although the district court held the regulation invalid in all applications, the defendants argue that the regulation is invalid as it applies to them and disclaim a facial challenge.

The Due Process Clause "mandates that, before any person is held responsible for violation of the criminal laws of this country, the conduct for which he is held accountable be prohibited with sufficient specificity to forewarn of the proscription of said conduct." United States v. Anzalone, 766 F.2d 676, 678 (1st Cir. 1985).  "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461

U.S. 352, 357 (1983). See also Grayned v. City of Rockford, 408 U.S. 104, 108 (1972); Bouie v. City of Columbia, 378 U.S. 347, 350-51 (1964).

The mere fact that a statute or regulation requires interpretation does not render it unconstitutionally vague. "Many statutes will have some inherent vagueness . . . . Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid." Rose v. Locke, 423 U.S. 48, 49-50 (1975). This is particularly the case where, as here, the statute deals with economic regulation and is addressed to sophisticated businessmen and corporations which, because of the complexity of the regulatory regime, necessarily consult counsel in planning their activities, and where an administrative process exists to secure advisory interpretations of the statute. Hoffman Estates, 455 U.S. at 498; see also McConnell v. FEC, 124 S. Ct. 619, 675 n.64 (2003). The regulation here was reasonably susceptible to the construction that we have adopted. There is no basis for invalidating ECCN 1312A as failing to provide fair notice.

Defendants cite a line of cases from the District of Columbia Circuit for the proposition that when a regulation lacks "ascertainable certainty," the regulated party's reasonable interpretation of the regulation will be accepted if otherwise a

-31-

drastic penalty would result.  See Trinity Broad. of Fla., Inc. v. FCC, 211 F.3d 618 (D.C. Cir. 2000); United States v. Chrysler Corp., 158 F.3d 1350 (D.C. Cir. 1998); Gen. Elec. Co. v. EPA, 53 F.3d 1324 (D.C. Cir. 1995); Rollins Envtl. Servs. (NJ) Inc. v. EPA, 937 F.2d 649 (D.C. Cir. 1991); Gates & Fox Co. v. Occupational Safety & Health Rev. Comm'n, 790 F.2d 154 (D.C. Cir. 1986).  This court recognized a similar rule in Anzalone, 766 F.2d at 681-82.

These cases, however, do not stand for the proposition that any ambiguity in a regulation bars punishment.  Rather, they are addressed only to situations in which: (1) the agency had given conflicting public interpretations of the regulation, or, (2) the regulation is so vague that the ambiguity can only be resolved by deferring to the agency's own interpretation of the regulation (i.e. a situation in which the ambiguity is resolved by something comparable to a step-two analysis under Chevron), and the agency has failed to provide a sufficient, publicly accessible statement of that interpretation before the conduct in question.

When the agency itself issues contradictory or misleading public interpretations of a regulation, there may be sufficient confusion for a regulated party to justifiably claim a deprivation of fair notice.  For example, in Anzalone, the statute required that a financial institution "and any other participant" to report a transaction of more than $10,000.  However, the Treasury regulation only specified that financial institutions needed to

-32-

file such reports.  766 F.2d at 681.  We concluded that because the "ambiguity regarding coverage of the [statute] and its regulations ha[d] been created by the government itself," the defendant could not be punished because he was not a "financial institution."  Id. In General Electric, the court highlighted that a regional office of the agency had issued an opinion letter subscribing to a contrary definition of the regulation, describing it as "unlikely that regulations provide adequate notice when different divisions of the enforcing agency disagree about their meaning."  53 F.3d at 1332.  Similarly in Trinity Broadcasting, the agency had previously provided a conflicting interpretation of a "nearly identical regulation." 211 F.3d at 629-30.  See also Rollins, 937 F.2d at 653 & n.3 (penalty should be mitigated where publicly available summary of agency report stated that "various EPA offices [had] been giving conflicting guidance").

Even if the agency does not issue contradictory public statements, it may fail to give sufficient fair notice to justify a penalty if the regulation is so ambiguous that a regulated party cannot be expected to arrive at the correct interpretation using standard tools of legal interpretation, must therefore look to the agency for guidance, and the agency failed to articulate its interpretation before imposing a penalty.  See PMD Produce Brokerage Corp. v. USDA, 234 F.3d 48, 53 (D.C. Cir. 2000) ("The Secretary's Rules of Practice are silent . . . .  Nor would the .

-33-

. . underlying rationale for the procedures in [the regulation] compel an interpretation of the regulations.").

The General Electric/Trinity Broadcasting line of cases do not apply here. The phrase "specially designed" is not so ambiguous that standard tools of legal construction fail and a regulated party must necessarily look to the agency for an interpretation. As we have found, the meaning of the "specially designed" may be ascertained by reference to the underlying policies of the EAA.

While the defendants contend that Commerce officials arrived at conflicting interpretations of ECCN 1312A, the vast majority of those interpretations were not public. Nothing in the General Electric/Trinity Broadcasting line of cases suggests that such non-public statements may create the kind of confusion that supports a finding of a due process violation.[16]

In an effort to identify public agency statements to support their vagueness challenge, defendants rely on Commerce's earlier published definition of "specially fabricated," which specified that a part "is not a specially fabricated part for [a] machine unless it is so constructed that its use for all practical purposes is limited to that machine." (J.A. at 754.) They assert that

_____

[16] See General Electric, 53 F.3d at 1329 (holding that regulated parties must be able to ascertain the meaning of the statute by "reviewing the regulations and other public statements issued by the agency" (emphasis added)); see also Trinity Broadcasting, 211 F.3d at 628.

-34-

"specially designed" replaced "specially fabricated" and appear to argue that they were entitled to rely on Commerce's definition of "specially fabricated." However, any similarity between these terms does not rise to the level of being "nearly identical." Trinity Broadcasting, 211 F.3d at 629-30. We therefore find that the defendants were not entitled to rely on the definition of "specially fabricated" as creating confusion as to the meaning of the term "specially designed."

The defendants rely most heavily on affidavits concerning the participation of Commerce officials in industry seminars concerning EAA compliance at which public statements were made regarding Commerce's interpretation of the term "specially designed." Some of these affidavits state that Commerce officials who presented at these seminars, though not authorized to offer opinions on commodity classifications, were directed by Commerce to be "as open and candid as possible in answering the questions of seminar attendees." (J.A. at 697.) These same affiants stated that at the seminars the officials provided an exclusive use definition of "specially designed." The defendants also rely on affidavits from industry representatives that confirm that such statements were made. See, e.g., (J.A. at 568.)[17]

---

[17] The relevant evidence on this matter include: an affidavit from Richard J. Sheil, a former Commerce official, who stated that he gave an exclusive use definition of "specially designed" when presenting at these seminars (J.A. at 515); an affidavit from an industry representative, Pat Paulson, who attested to hearing Sheil

Where the advice given by agencies has been considered in the General Electric/Trinity Broadcasting line of cases, they have involved formal contemporaneous agency interpretations reflected in related regulations, formal letters to regulated parties, and publicly distributed summaries of internal agency reports.  See, e.g., Trinity Broadcasting, 211 F.3d at 629-30 (related regulation); General Electric, 53 F.3d at 1332 (letters to regulated parties); Rollins, 937 F.2d at 653 n.3 (public summary of agency report).  In contrast, we do not think that informal statements made at industry seminars are the types of interpretations on which the defendants may properly rely, particularly because, as noted earlier, there was a formal process by which the defendants could have sought an advisory opinion from Commerce's Bureau of Industry and Security regarding whether their control panel was subject to regulation and, if so, its appropriate ECCN classification.

To allow informal statements by agency officials at industry seminars to provide a defense to criminal proceedings would be to invite a debilitating uncertainty in the enforcement of the criminal law.  Each criminal case would threaten to degenerate, as

provide an exclusive use definition at one such seminar (J.A. at 568); and an affidavit from John R. Black, another former Commerce official, who stated that he spoke at these seminars and that he understood "specially designed" to require exclusive use, but he did not state that he had communicated this understanding at the seminars at which he taught (J.A. at 701).

the facts of this case illustrate, into a contest between the prosecution and defense as to the nature and content of the officials' oral statements. Those intent on violating the law could attend such seminars with a view to planting questions that, in the future, could provide the basis for a defense to a criminal charge. We do not think that the General Electric/Trinity Broadcasting line of cases reaches this far.[18]

We also do not think that ECCN 1312A as written lends itself to "arbitrary and discriminatory enforcement." Courts are concerned with the possibility of arbitrary enforcement where a statute or regulation leaves broad discretion in the executive to determine what constitutes a criminal violation such that it may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." Kolender, 461 U.S. at 358 (quoting Smith v. Goguen, 415 U.S. 566, 575 (1974)). Just as there is no deficiency of fair notice, there is no concern for arbitrary or discriminatory enforcement under the circumstances in this case. Here, the regulation does not allow for a limitless range of interpretations of what constitutes criminal conduct. As

---

[18] The mere fact that, after the events in question, various public government statements also noted that the term "specially designed" was "confusing" and "ambiguous" also creates no issue of Due Process. After the defendants' convictions, the Bureau of Export Administration published a request for comments regarding the development of a definition for "specially designed" as it pertains to items on the Control List. 62 Fed. Reg. 56138 (Oct. 29, 1997). No definition has yet been published.

explained above, ECCN 1312A, as we have interpreted it, prohibits exporting without a validated license items designed to function with an embargoed HIP, whether the item is designed exclusively for this purpose or whether it is capable of serving other functions as well.  This is not an amorphous category of items that allows for a broad range of possible interpretations.

V.

The defendants argue that we should remand the case to the district court "to rule conditionally on the defendants' motion for an new trial," which it was required to do under Federal Rule of Criminal Procedure 29(d)(1).[19]  We agree that the district court should have ruled on the defendants' motion for a new trial.  We remand to the district court to rule on the defendants' motion for a new trial in light of the rulings reflected in this opinion.  We intimate no view as to the proper disposition of that motion.

In this connection, we note that the defendants contend on appeal that a new trial should be granted because informal agency advice and the private views of agency officials are necessarily relevant to their defense of lack of willfulness.  The Supreme Court in <u>Cheek</u> v. <u>United States</u>, 498 U.S. 192 (1991), held that a bona fide misunderstanding of the tax laws is a defense to willful

_____

[19] Rule 29(d)(1) reads: "If the court enters a judgement of acquittal after a guilty verdict, the court must also conditionally determine whether a motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed."

tax evasion. The defendants argue that the jury instructions required the jury to find willfulness; that under <u>Cheek</u> evidence of the objective reasonableness of their claimed belief that a license was not required is relevant to the issue of willfulness; that evidence as to the interpretation given to the term "specially designed" by Commerce and COCOM officials (even if undisclosed and informal) was admissible to show that their claimed belief was objectively reasonable; and that the United States was obliged to supply them with this evidence before the trial commenced or, alternatively, that this evidence is newly discovered evidence under Rule 33(a) of the Federal Rules of Criminal Procedure. The district court did not reach these issues. Although the defendants invite us to reach them on appeal, we think these issues are most appropriately addressed to the district court in the first instance in connection with the conditional motion for a new trial. We express no opinion as to the defendants' argument in these respects or whether these arguments were properly preserved in the new trial motion itself.

## VI.

For the foregoing reasons we <u>vacate</u> the district court's acquittal, reinstate the defendants' convictions, and remand for a ruling on the defendants' motion for a new trial.

<u>It is so ordered.</u>